**Yvonne A. HARVEY, Plaintiff,**

v.

**NOVARTIS PHARMACEUTICAL CORPORATION, Defendant.**

**Case No. 2:06–CV–1140–VEH.**

United States District Court,
N.D. Alabama,
Southern Division.

Oct. 4, 2012.

Annesley H. Degaris, Cory Watson Crowder & Degaris PC, Birmingham, AL, Robert G. Germany, Pittman Germany Roberts & Welsh LLP, Jackson, MS, for Plaintiff.

Frederick G. Helmsing, Jr., Edward S. Sledge, III, McDowell Knight Roedder & Sledge LLC, Mobile, AL, Gregory S. Chernack, Hollingsworth LLP, Katherine R. Latimer, Spriggs & Hollingsworth, Washington, DC, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION TO EXCLUDE CAUTION TESTIMONY OF PLAINTIFF'S NON–RETAINED EXPERT DR. JASON MILLER

VIRGINIA EMERSON HOPKINS, District Judge.

THIS CAUSE is before the court on Defendant Novartis Pharmaceutical Corp.'s Motion to Exclude Causation Testimony of Plaintiff's Non–Retained Expert Dr. Jason Miller (Doc. 27) (the "Motion"). Plaintiff responded to the Motion on April 16, 2012. Novartis filed a reply on April 30, 2012. The Motion is now ripe for disposition.

## I. BACKGROUND

This case arises out of a series of lawsuits by hundreds of individual plaintiffs who developed osteonecrosis of the jaw, a severe bone disease, allegedly as a result of taking FDA-approved prescription medications Zometa and Aredia. Zometa and Aredia are bisphosphonate drugs produced by Novartis that are administered intravenously, most often to cancer patients. The drugs are effective at preventing pathological fractures, spinal cord compression, and other bone pains.

Plaintiff Yvonne Harvey[1] ("Harvey") filed an individual lawsuit against Novartis

---

1. Harvey died on October 21, 2006, due to complications from colon cancer. This law- suit, therefore, is carried forward by her son,

alleging that she developed osteonecrosis of the jaw as a result of taking Zometa. Harvey was prescribed Zometa around September 2002 as a post-cancer treatment for bone loss or osteoporosis. (Doc. 1, ¶ 5). She used Zometa weekly, as prescribed. (*Id.*). On July 25, 2005, she was diagnosed with Avascular osteonecrosis of the jaw. (*Id.,* ¶ 6).

Harvey filed her products liability action in this Court on June 9, 2006. (Doc. 1). Subsequently, the Judicial Panel on Multidistrict Litigation ("JPML") decided to centralize the cases involving Zometa and Aredia and transferred them to the Middle District of Tennessee for consolidated pretrial proceedings. (Doc. 9.) The multidistrict litigation ("MDL") cases were assigned to Chief District Judge Todd J. Campbell.

During the consolidated pretrial proceedings, Harvey designated Dr. Jason Miller as her case-specific expert on causation. (Doc. 22 at 3.) Dr. Miller diagnosed and treated Harvey's osteonecrosis of the jaw. He will testify that biphosphonate drug use (i.e., Zometa) caused her injury. (Doc. 30–5 at 21.)

After Judge Campbell completed the consolidated pretrial proceedings, the JPML remanded Harvey's case back to this Court on July 26, 2011, pursuant to 28 U.S.C. § 1407(a). (Doc. 10 at 1.) Following remand, Harvey requested leave to designate a new case-specific expert on causation. (Doc. 18.) The court denied the motion on January 12, 2012, 2012 WL 113317. (Doc. 22.) On March 16, 2012, Novartis filed the Motion to exclude Dr. Miller's testimony on causation. Novartis contends that (1) Dr. Miller is not qualified to offer an expert opinion about the cause

of Harvey's osteonecrosis, and that (2) Dr. Miller's opinion is unreliable under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*

## II. STANDARD FOR THE ADMISSIBILITY OF EXPERT TESTIMONY

### A. General Requirements—Judge as gatekeeper

█ Regarding expert testimony, the Federal Rules of Evidence provide:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702 (2011). In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* the Supreme Court established that district judges act as "gatekeepers" for expert testimony. *See* 509 U.S. 579, 592–93, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993). The district judge must assess the proffered testimony and make a preliminary determination about the scientific validity of the expert's reasoning and methodology. *Id.* District Judge Lynwood Smith recently described the district judge role under *Daubert* in this way:

Federal Rule of Evidence 702, read together with the trilogy of Supreme Court opinions [2] that led to the Rule's

---

Dan Harvey, who serves as the personal representative of his mother's estate.

**2.** The three opinions are *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167,

143 L.Ed.2d 238 (1999), *General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), and *Daubert.*

revision in 2011, compels the district courts to perform a "gatekeeping" function when determining the admissibility of expert scientific and technical evidence. *See, e.g., United States v. Abreu,* 406 F.3d 1304, 1306 (11th Cir.2005) (quoting *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004)). "This function inherently requires the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Id.* (internal quotation omitted). *Broussard–Wadkins v. Maples,* CV–09–S–1563–NE, Doc. 119 at *7–8 (N.D.Ala. Sept. 28, 2012).

## B. The Eleventh Circuit Test for Admissibility

■ The Eleventh Circuit has established a three part inquiry for district courts to follow in performing their gatekeeper role. For evidence to be admissible under Rule 702, the district court must find that:

(1) the expert is *qualified* to testify competently regarding the matters he intends to address;

(2) the methodology by which the expert reaches his conclusions is *sufficiently reliable* as determined by the sort of inquiry mandated in *Daubert*; and

(3) the testimony [will] *assist*[ ] the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Hendrix ex rel. G.P. v. Evenflo Co., Inc.,* 609 F.3d 1183, 1194 (11th Cir.2010) (citing *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004)) (emphasis added). The party offering the testimony must meet each prong by a preponderance of the evidence. *Id.* Here, Novartis contends

that Dr. Miller's testimony should be excluded under Prong One and Prong Two.[3]

### 1. *Prong One—The Expert Must Be Qualified to Testify to the Relevant Issue*

■ To meet Prong One, a party must show that the expert has sufficient "knowledge, skill, experience, training, or education" to form a reliable opinion about the relevant issue. Experience in a particular field is not enough to qualify an expert; the expert must have experience with the issue before the court. *See Hendrix ex rel. G.P.,* 609 F.3d at 1194. For example, in *Memphis–Shelby County Airport Authority v. Illinois Valley Paving Co.,* the proposed expert had extensive experience installing and maintaining certain cables. 2006 WL 5981486, *3 (W.D.Tenn. July 26, 2006). The proposed expert offered to testify that he had experience with many cracked cables and that he could anticipate when a cable would crack. However, because the issue before the court was what caused the cable to crack, the proposed expert was not qualified to testify on that issue. The court found that the proposed expert's experience in maintaining and installing the cables did not mean he had specialized knowledge about the reasons the cables had cracked. *Id.*

Additionally, the Sixth Circuit, in a case very similar to this one, concluded that a district court did not abuse its discretion in excluding the testimony of the plaintiff's expert. *See Thomas v. Novartis Pharm. Corp.,* 443 Fed.Appx. 58, 63 (6th Cir.2011) (unpublished). The expert in *Thomas* was "an experienced maxillofacial surgeon who ha[d] treated several patients with osteonecrosis of the jaw." *Id.* However, the expert had not established his credentials to "diagnose the cause of [the plaintiff's] osteonecrosis ... which [was] the salient

**3.** Novartis does not contend that Dr. Miller's testimony would not assist the jury.

issue his opinion was offered to establish." *Id.*

## 2. *Prong Two—The Expert's Opinion Must Be Sufficiently Reliable*

 To meet Prong Two, a party must show that the proffered expert opinion is sufficiently reliable. A district court has substantial discretion in deciding how to test the reliability of an expert's testimony. *See Rink v. Cheminova, Inc.,* 400 F.3d 1286, 1292 (11th Cir.2005). Pursuant to *Daubert,* the court should consider the following factors: "(1) whether the expert's methodology can be tested; (2) whether the expert's scientific technique has been subjected to peer review and publication; (3) whether the method has a known rate of error; (4) whether the technique is generally accepted by the scientific community." *Id.* (citing *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir.2003)). However, these factors are not exhaustive and a court "should consider any additional factors that may advance its Rule 702 analysis." *Quiet Tech. DC–8, Inc.,* 326 F.3d at 1341.

In this case, Dr. Miller contends his opinion is based on a differential diagnosis.[4] A "[d]ifferential diagnosis is accomplished by determining the possible causes for the patient's symptoms and then eliminating each of these potential causes until reaching one that cannot be ruled out or determining which of those that cannot be excluded is the most likely." *Guinn v. AstraZeneca Pharm. LP,* 602 F.3d 1245, 1253 (11th Cir.2010) (citing *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir.1999)).

The Eleventh Circuit has specifically addressed the reliability of differential diagnoses under Prong Two. *Guinn,* 602 F.3d at 1253; *see also Kilpatrick v. Breg, Inc.,* 613 F.3d 1329, 1342–43 (11th Cir.2010); *McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1252–53 (11th Cir.2005). In *Guinn v. AstraZeneca Pharmaceuticals LP,* the Eleventh Circuit explained that a reliable differential diagnosis has two steps. 602 F.3d at 1253. First, the expert must identify and consider the factors which could be the "sole cause of the plaintiff's injury." *Id.* Second, the expert "must provide a reasonable explanation" for his conclusion that the other potential causes identified in step one are not the sole cause of the plaintiff's injury. *Id.* A court must examine for itself whether the expert properly considered other potential causes for the plaintiff's injury and properly excluded them. *Id.*

## III. ANALYSIS

Novartis asks this court to exclude Dr. Miller's testimony regarding the cause of Harvey's osteonecrosis of the jaw. Thus, the relevant issues are whether Dr. Miller is qualified to testify as to the cause of Harvey's injury, and whether Dr. Miller's opinion that biphosphonate drug use caused her injury is sufficiently reliable under *Daubert.* The court will address each in turn.

## A. Dr. Miller's Credentials Do Not Qualify Him as an Expert Witness on the Cause of Harvey's Osteonecrosis

Novartis contends that Dr. Miller is not qualified for two reasons. First, Novartis contends that Dr. Miller does not consider himself an expert "*on the cause* of osteonecrosis of the jaw." (Doc. 30–5 at 20) (emphasis added). Second, Novartis contends

---

4. At his deposition, Dr. Miller testified that he normally performs a differential diagnosis on his patients, but admitted there is no differential diagnosis noted in Harvey's medical charts. (Doc. 30–5 at 20.) Nonetheless, the court will assume, for the sake of deciding the Motion, that Dr. Miller performed a differential diagnosis on Harvey.

that Harvey has not established by a preponderance of the evidence that Dr. Miller is qualified to offer an opinion on the cause of Harvey's injury. In response, Harvey contends that Dr. Miller's credentials "speak for themselves." (Doc. 30 at 8.)

Initially, the court rejects Novartis's contention that Dr. Miller is not an expert simply because he said he does not consider himself an expert. Just as an individual cannot simply declare himself to be an expert, a person cannot simply declare himself not to be an expert. Instead, the court must examine the individual's education, training, and experience, and decide if these credentials make the individual qualified to offer an expert opinion.

■ The court has reviewed Dr. Miller's credentials. He is an experienced maxillofacial surgeon and is certified by the American Board of Oral and Maxillofacial Surgery. (Doc. 30–4 at 3.) He has received various awards in his field. He has given professional presentations on odontogenic cysts and neoplasms of the jaw and on diagnosing and treating oral cancers. He has published an article titled "Intraoperative Imaging Techniques" and submitted another titled "Melanocytic Colonization of Oral Carcinoma In Situ." These credentials establish that Dr. Miller is an experienced maxillofacial surgeon. He is certainly qualified to testify as an expert on matters within the ordinary expertise of maxillofacial surgeons.

However, Harvey has not established that maxillofacial surgeons (and Dr. Miller in particular) are qualified to opine as to the cause of osteonecrosis of the jaw. In fact, Dr. Miller's testimony confirms that his education, training, and experience have little to do with determining the cause of osteonecrosis. Dr. Miller testified that he does not conduct medical or scientific research, has never researched osteonecrosis of the jaw, has never researched biphosphonates, has never published or

submitted a paper on either osteonecrosis of the jaw or biphosphonates, and has never taught on either subject. (Doc. 30–5 at 8.) Furthermore, Dr. Miller testified that the cause of Harvey's osteonecrosis did not really matter to him because he was going to treat her condition the same way regardless of its cause. (Doc. 30–5 at 21.) Thus, Dr. Miller's credentials do not establish that he has the requisite expertise to determine the cause of Harvey's osteonecrosis.

The following deposition excerpt further emphasizes that while Dr. Miller is qualified to treat osteonecrosis of the jaw, he is not necessarily qualified to opine about its cause.

Q: Doctor, based on your education, training, and experience, are you qualified *to treat* [osteonecrosis of the jaw]?

A: I'm more qualified than most general dentists or primary physicians, yes.

Q: Is there a medical specialty you think is better qualified *to treat* [this condition]?

A: No.

. . .

Q: Do you have an opinion *as to the cause* of her [osteonecrosis of the jaw] based on your education, training, and experience?

. . .

A: My opinion is that it was related to the biphosphonates, you know. That's my opinion. Obviously, like we talked about prior, I can't prove that, but that's my opinion.

(Doc. 30–5 at 21) (emphasis added). But, Dr. Miller did not form his opinion based on his education, training, and experience regarding the causes of osteonecrosis of the jaw. Instead, he was aware of the purported relationship between osteone-

crosis and biphosphonate use, and he formed his opinion based solely on Harvey's past use of biphosphonates. (Doc. 30–5 at 14.) Dr. Miller was aware of other potential causes of Harvey's osteonecrosis, (Doc. 30–5 at 18, 21), but, during the course of her treatment, he never ruled them out (Doc. 30–5 at 20). Dr. Miller did order a biopsy to rule out osteomyelitis, but he admits the results were inconclusive. (Doc. 30–5 at 15.) Indeed, Dr. Miller more than once testified that he *assumed* that biphosphonates had caused Harvey's osteonecrosis. (Doc 30–5 at 14, 18, 20.) The fact that Dr. Miller formed his opinion based on an assumption about the relationship between biphosphonates and osteonecrosis of the jaw shows he has little expertise in determining the cause of osteonecrosis.

Additionally, the court finds the Sixth Circuit's unpublished opinion in *Thomas v. Novartis Pharmaceuticals Corp.*, 443 Fed. Appx. 58, to be on point and its reasoning to be strongly persuasive. Like the expert in *Thomas,* Dr. Miller has extensive training in maxillofacial surgery, but practically no experience in identifying the specific cause of osteonecrosis of the jaw. *Id.* at 63. And, like in *Thomas,* the issue before the court is not *if* Harvey had osteonecrosis of the jaw, but what *caused* her to have it. *Id.*

Harvey contends that other courts have allowed treating maxillofacial surgeons to testify about the cause of a plaintiff's osteonecrosis. She cites *Deutsch v. Novartis Pharmaceuticals Corp.*, 768 F.Supp.2d 420, 475 (E.D.N.Y.2011). The court finds that Harvey's reliance on *Deutsch* is misplaced. *Deutsch* is distinguishable from this case because the treating maxillofacial surgeon in *Deutsch* had conducted and published studies linking biphosphonates to osteonecrosis of the jaw. Moreover, the plaintiff was a patient in one of the surgeon's published studies on that topic.

Harvey also cites Judge Campbell's unpublished opinion in *Baldwin/Winter v. Novartis Pharmaceutical Corp.* (Doc. 30–3.) In *Baldwin/Winter,* Judge Campbell permitted the plaintiff's treating maxillofacial surgeon to testify about the cause of the plaintiff's osteonecrosis. While the facts of *Baldwin/Winter* are more similar to the instant case than those in *Deutsch,* the court finds *Baldwin/Winter* unpersuasive. In *Baldwin/Winter,* Judge Campbell offered little analysis about the reasons the maxillofacial surgeon was qualified to offer an expert opinion. Moreover, Judge Campbell appears to have based his opinion in part on the sincerity of the surgeon's belief that biphosphonate drug use caused the plaintiff's injury. But, sincerity alone is not enough to qualify an expert under Rule 702.

For the foregoing reasons, the court finds that Dr. Miller is not qualified to offer an expert opinion about the cause of Harvey's osteonecrosis.

### B. Because Dr. Miller Failed to Perform a Proper Differential Diagnosis, His Opinion Is Not Sufficiently Reliable under Eleventh Circuit Precedent.

Dr. Miller asserts that his opinion is based on a differential diagnosis. (Doc. 30–5 at 20.) Novartis contends that Dr. Miller's differential diagnosis is unreliable because he failed to rule out other potential causes of Harvey's osteonecrosis. In response, Harvey contends that Dr. Miller ruled out osteoradionecrosis, which is "the only condition in oral surgery similar to what [Dr. Miller] saw." (Doc. 30 at 9.)

The court agrees with Novartis that Dr. Miller's differential diagnosis fails the Eleventh Circuit's test for reliability. Early in Harvey's treatment, Dr. Miller identified osteomyelitis as a potential cause of her osteonecrosis. (Doc. 30–5 at 14.)

He ordered a bone biopsy to rule out osteomyelitis, but the results were inconclusive. (Doc. 30–5 at 15.) Dr. Miller never ruled out osteomyelitis. Moreover, Dr. Miller, as Harvey's treating physician, had no incentive to rule out osteomyelitis because, whether her condition was caused by osteomyelitis or biphosphonate drug use, her treatment was going to be the same. (Doc. 30–5 at 20.) As far as the court is aware, Dr. Miller has never offered a reason—other than his assumption—for concluding that biphosphonate drug use, instead of osteomyelitis, caused Harvey's osteonecrosis. (Doc. 30–5 at 14, 18, 20.) Under *Guinn*, Dr. Miller's failure to give a reasonable explanation for concluding that biphosphonate drug use rather than osteomyelitis caused Harvey's injury renders his differential diagnosis not sufficiently reliable. 602 F.3d at 1253.

Harvey's focus on osteoradionecrosis misses the point. Osteoradionecrosis is a condition involving dead bone in the jaw caused by exposure to radiation. (Doc. 30–5 at 21.) A physician can rule out osteoradionecrosis if a patient has no history of radiation exposure. (Doc. 30–5 at 20.) But, eliminating radiation as a potential cause of Harvey's osteonecrosis does not establish that biphosphonate drug use caused her osteonecrosis. Osteomyelitis remained a potential cause of Harvey's condition. Because Dr. Miller never offered a principled reason for ruling out osteomyelitis, his opinion that Zometa caused Harvey's osteonecrosis would be nothing more than speculation and conjecture.

For the foregoing reasons, the court finds that Dr. Miller's opinion is not sufficiently reliable under Rule 702 and *Daubert*.

## IV. CONCLUSION

For the foregoing reasons, Novartis's Motion to Exclude the Causation Testimony of Plaintiff's Non–Retained Expert Dr. Jason Miller is due to be, and hereby is, **GRANTED**.